## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| DR. ROGER C. S. LIN<br>No. 100-1, Yuanlinkeng Rd.,<br>Guishan Dist.,<br>Taoyuan City 333, Taiwan, | ) ) ) ) ) | |
| JULIAN T. A. LIN<br>No. 100-1, Yuanlinkeng Rd.,<br>Guishan Dist.,<br>Taoyuan City 333, Taiwan, and | ) ) ) ) ) | |
| TAIWAN CIVIL GOVERNMENT<br>No. 100-1, Yuanlinkeng Rd.,<br>Guishan Dist.,<br>Taoyuan City 333, Taiwan, | ) ) ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA and | ) ) | |
| REPUBLIC OF CHINA, | ) ) | |
| Defendants. | ) ) | |

_____)

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Dr. Roger C.S. Lin, Julian T. A. Lin, and the Taiwan Civil Government ("TCG") (collectively, "Plaintiffs") hereby file this Complaint for Declaratory Judgment and allege as follows:

### I.

### PRELIMINARY STATEMENT

1.     In 1945, following Japan's surrender to the United States and the other allied powers (the "Allied Powers") at the end of World War II, at the request and on behalf of the Allied

Powers and the United States, Generalissimo Chiang Kai-shek undertook the administration and governance of Taiwan.[1]  Chiang Kai-shek was the head of the Nationalist Chinese Party of the Republic of China (the "ROC").[2]

2.      Generalissimo Chiang Kai-shek began formally acting on behalf of the United States pursuant to General Order No. 1, approved August 17, 1945, by President Truman,[3] which ordered that "Japanese commanders and all ground, sea, air and auxiliary forces within China (excluding Manchuria), Formosa and French Indo-China north of 16 north latitude shall surrender to Generalissimo Chiang Kai-shek."

3.      Japan's formal surrender soon followed on September 2, 1945, when the Emperor of the Japanese Government and the Japanese Imperial General Headquarters executed an "Instrument of Surrender" aboard the battleship USS Missouri in Tokyo Bay.

4.      On October 25, 1945, representatives of Generalissimo Chiang Kai-shek (hereafter "Generalissimo") accepted the surrender of the Japanese commanders and auxiliary forces as required by General Order No. 1.

---

[1] In the post-war period, Taiwan was variously referred to as Formosa.

[2] Chiang Kai-shek, along with nearly two million of his supporters, fled Mainland China during the course of 1949 to escape the rise of communist forces who took over mainland China and eventually founded the People's Republic of China ("PRC") on October 1, 1949.

[3] *See* Joint Chiefs of Staff 17 August 1945 "Note by the Secretaries" (J.C.S. 1467/2, *Cong. Rec*. Sept. 6, 1945) ("General order No. 1 (Enclosure), as approved by the President for issue by the Japanese Imperial General Headquarters by direction of the Emperor, is circulated for information. The President approved it with the understanding that it is subject to change both by further instructions issued by the Joint Chiefs of Staff and by changes in the matters of detail made by the Supreme Commander for the Allied Powers [General Douglas MacArthur] in the light of the operational situation as known by him.").

5.      Before and after entry into force of the Treaty of Peace with Japan in San Francisco, California, known as the San Francisco Peace Treaty ("SFPT"),[4] the United States, as the principal occupying power of Taiwan, was responsible for the actions of its agent, Generalissimo and now the ROC, for matters within the scope of their authorities granted by the United States.  Thus, for the purposes of the declarations sought by the Plaintiffs, this Court is fully competent to adjudicate the legality of the actions of the United States' agent, the ROC.

6.      While acting as an agent of the United States, the ROC promulgated nationality decrees in 1946 that acted to illegally strip Japanese nationals living on Taiwan, as well as their descendants, of their Japanese nationality in violation of international law.

7.      The ROC's nationality decrees imposed upon the people of Taiwan, without the express or implied consent of the people of Taiwan, an ROC nationality that, to this day, does not offer the people of Taiwan an internationally accepted nationality.

8.      The Plaintiffs, acting for themselves and on behalf of thousands of their organization's members, both personally, and through their descendants, were stripped of their Japanese nationality as a result of the ROC's illegal nationality decrees.

9.      The ROC, on behalf of and as the agent for the United States, defined as the "principal occupying power" under the still-in-effect San Francisco Peace Treaty that formally ended World War II, continues to govern Taiwan.

---

[4] Treaty of Peace with Japan, Sept. 8, 1951, Allied Powers-Japan, 136 U.N.T.S. 46 (ratification advised by Senate, Mar. 20, 1952; ratified by President, Apr. 15, 1952; ratification deposited at Washington, Apr. 28, 1952; proclaimed by President Apr. 28, 1952; entered into force Apr. 28, 1952) (hereinafter "SFPT").

10.     The people of Taiwan are "without a state"[5] and, to this day, in a circumstance of continually trying "to concretely define their national identity...."[6]

11.     The Plaintiffs seek a declaration that the nationality decrees of 1946 violated international law, illegally depriving the Plaintiffs of a recognized nationality.

12.     The Plaintiffs seek a declaration that the nationality decrees of 1946 were promulgated without the authority of the United States.

13.     The Plaintiffs seek a declaration that the nationality decrees of 1946, stripping the people of Taiwan of their Japanese nationality and imposing a nationality of the ROC, are thus invalid.

## II.

## PARTIES

14.     Plaintiff Dr. Roger C. S. Lin is a spokesperson and member of the Taiwan Civil Government, whose address is No. 100-1, Yuanlinkeng Rd., Guishan Dist., Taoyuan City 333, Taiwan.

15.     Plaintiff Julian T. A. Lin is a spokesperson and member of the Taiwan Civil Government, whose address is No. 100-1, Yuanlinkeng Rd., Guishan Dist., Taoyuan City 333, Taiwan.

16.     Plaintiff Taiwan Civil Government is a political and educational organization in Taiwan, committed to advocating for the rights of their over 30,000 Taiwanese members.  Plaintiff Taiwan Civil Government's address is No. 100-1, Yuanlinkeng Rd., Guishan Dist., Taoyuan City 333, Taiwan.

---

[5] *Lin v. United States*, 539 F. Supp. 2d 173, 180 (D.D.C. 2008).

[6] *Lin v. United States*, 561 F.3d 502, 503 (D.C. Cir 2009), *cert. denied*, 558 U.S. 875 (2009).

17.     Defendant United States of America was, at the time of the relevant facts, responsible for the actions of the Chiang Kai-Shek-led Republic of China government, under a theory of agency, as the then-occupying power of Taiwan.

18.     Defendant The Republic of China was, at the time of the relevant facts, the administration overseeing the governance of Taiwan under the authority of the Allied Powers, and acted to deprive the Plaintiffs of the Japanese nationality in violation of international law.

## III.

## JURISDICTION AND VENUE

19.     The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, which provides that the District courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

20.     The Court has jurisdiction over all of the Plaintiffs claims against the Republic of China pursuant to, *inter alia*, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.S. §§ 1602-1611.   While the sovereignty and statehood of the Republic of China is a matter of international dispute – and not an issue in this case -- the applicability of the FSIA to the Republic of China is a question long-settled by this court, regardless of the current status or legitimacy of that administration.[7]

---

[7] *KAO HWA Shipping Co., S.A. v. China Steel Corp.*, 816 F. Supp. 910, 914 (S.D.N.Y. 1993) ("Subject matter jurisdiction over trade instrumentalities of the ROC is governed exclusively by the FSIA**,** even though the United States does not recognize that government. *Millen Indus., Inc. v. Coordination Council for N. Am. Affairs,* 855 F.2d 879, 882-83, 272 U.S. App. D.C. 240 (D.C. Cir. 1988); Taiwan Relations Act, 22 U.S.C. § 3303(b)(1) ("whenever the laws of the United States refer or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such law shall apply with respect to Taiwan.")).

21.     Customary international law is incorporated into the domestic law of the United States, to the extent that "there is no treaty, and no controlling executive or legislative act or judicial decision" in conflict.[8]

22.     Article 15 of the Universal Declaration of Human Rights states:

(1) Everyone has the right to a nationality.
(2) No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.[9]

23.     There is no treaty, controlling executive or legislative act or judicial decision that purports to invalidate the right to a nationality as articulated in the Universal Declaration of Human Rights.

24.     This Court has jurisdiction pursuant to the Administrative Procedure Act ("APA") § 702, 5 U.S.C. § 702.

25.     This Court possesses the authority to award declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

26.     Venue is proper in this district under 28 U.S.C. § 1391, as well as 5 U.S.C. § 703.

---

[8] RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, § 111 (1) (1987) (expressly declaring that customary international law is part of federal law); *see also The Paquete Habana*, 175 U.S. 677, 700 (1900), *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003); *Galo-Garcia v. I.N.S.*, 86 F.3d 916 (9th Cir. 1996) ("where a controlling executive or legislative act ... exist[s], customary international law is inapplicable"); *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1453 (11th Cir.), cert. denied, 479 U.S. 889 (1986).

[9] 1948 Universal Declaration of Human Rights, art. 15.

# IV.

# BACKGROUND

## Treaty of Shimonoseki

27.     At the conclusion of the Sino-Japanese War in 1895, the Chinese Emperor transferred Taiwan to the Japanese Emperor.[10]

28.     This transfer was formalized in the Treaty of Shimonoseki, which was signed on April 17, 1895 and entered into force on May 8, 1895, concluded the Sino-Japanese war.

29.     Specifically, the Treaty of Shimonoseki transferred sovereignty and title to Formosa, providing that: "China ceded to Japan in perpetuity and full sovereignty . . . [t]he island of Formosa, together with all islands appertaining or belonging to the said island of Formosa."[11]

30.     Article 5 of the Treaty of Shimonoseki additionally provided that:

> The inhabitants of the territories ceded to Japan who wish to take up their residence outside the ceded districts shall be at liberty to sell their real property and retire. For this purpose a period of two years from the date of the exchange of ratifications of the present Act shall be granted. At the expiration of that period those of the inhabitants who shall not have left such territories shall, at the option of Japan, be deemed to be Japanese subjects.[12]

31.     As a result, millions of Taiwanese living on the island of Formosa opted to become Japanese nationals, with only 0.16% of the population opting for Chinese nationality.[13]

---

[10] *Lin* at 504 *citing* Treaty of Shimonoseki, China-Japan, art. 2(b), April 17, 1895, 181 Consol. TS 217.

[11] *Id.*

[12] Treaty of Shimonoseki, China-Japan, art. 5.

[13] Chen, Lung-chu and Reisman, W. Michael, "Who Owns Taiwan: A Search for International Title" (1972). Faculty Scholarship Series.  Paper 666 at pg. 652, n. 200.

### The Allies' Defeat of Japan

32.     On December 7, 1941, the Japanese naval and air force attacked the American naval base at Pearl Harbor, Hawaii.  The United States Congress responded by issuing a Declaration of War against Japan on December 8, 1941.

33.     The United States, joined by the Allied Powers, obtained the surrender of Japan on September 2, 1945.

34.     General Douglas MacArthur, Supreme Commander for the Allied Powers, issued General Order No. 1 ordering the "senior Japanese commanders and all ground, sea, air and auxiliary forces within . . . Formosa" to "surrender to Generalissimo Chiang Kai-shek."[14]  Notably, the role of Chiang Kai-shek, leader of the Chinese Nationalist Party, was defined as the "**representative** of the Allied Powers empowered to accept surrender[]" of the Japanese forces in Taiwan.[15]  On October 25, 1945, Chiang Kai-shek's representative accepted the surrender of Japanese forces remaining in Taiwan.  Notably, the surrender of Japanese forces in Taiwan was assisted by the United States Armed Forces.  The fact that Chiang Kai-shek accepted the surrender of the Japanese Emperor on behalf of the Allied Powers is later reflected in a number of internal State Department records.  A June 1949 Memorandum reflected that, "[a]t the time of the surrender of Japan military (sic)[,] responsibility for accepting and carrying out the surrender in respect of Formosa was delegated by the allies to Chiang Kai shek."[16]

---

[14] Lin at 504 *citing* 91 CONG. REC. S8348-49 (1945) (Text of Japanese Order).

[15] Supreme Commander for the Allied Powers General Order No. 1, Sept. 2, 1945, J.C.S. 1467/2 (emphasis added).

[16] Department of State Office Memorandum from Mr. Harding F. Bancroft to Mr. Rusk, dated June 6, 1949.

35.     Likewise, in an internal Department of State telegram from February 1949, a State Department official stated that the United States Government "has since V-J Day facilitated Chinese de factor control over Formosa by transporting [Chinese] troop and civil authorities from mainland but present legal status Formosa portion [of the former Japanese Empire] awaiting final formalization peace settlement for Japan."[17]

## Nationality Decrees of 1946

36.     On January 12, 1946, the Chinese National Government (the "ROC") issued a decree mandating, effective December 25, 1945, the automatic restoration of Chinese nationality for the people of Taiwan.

The decree stated:

> The people of Taiwan are people of our country. They lost their nationality because the island was invaded by an enemy.  Now that the land has been recovered, the people who originally had the nationality of our country shall, effective December 25, 1945, resume the nationality of our country.  This is announced by this general decree in addition to individual orders.[18]

37.     The ROC did not consider the resultant loss of Japanese citizenship to constitute "voluntary renunciation."[19]

38.     On June 22, 1946, the Republic of China issued a decree on Measures Concerning the Nationality of Overseas Taiwanese (also translated as "Measures For The Adjustment of Nationality of Taiwanese Abroad").  The measure provided that persons living outside of Taiwan

---

[17] Department of State Telegram, dated February 14, 1949.

[18] Swan Sik Ko, *ed.*, Nationality and International Law in Asian Perspective, T.M.C. Asser Instituut, The Hauge, 1990 at pg. 53 (providing English translation of January 12, 1946 Decree). This translation notes the effective date as December 25, 1945, even though secondary sources reference the effective date as October 25, 1945.

[19] *Id., citing* Judicial Yuan Interpretation 36 [1947], Chieh No. 3571.

would likewise have Chinese nationality restored to them, and issued a certificate of registration. The measure provided, in part, that:

> Beginning from October 25, 1945, Chinese nationality shall be restored to Taiwanese. Notice of this will be sent by the Ministry of Foreign Affairs by separate telegrams to the various diplomatic missions abroad, to be brought to the attention of the Governments of the countries to which they are accredited for notification to the authorities of territories under their jurisdiction.[20]

39.     As made plain by a clarification issued on February 28, 1948 by the Executive Yuan of the ROC, the 1946 Nationality Decrees had little sympathy for the challenges presented to married couples and families with mixed Japanese and Taiwanese nationalities.  Japanese nationals refusing to accept Chinese nationality were ordered to be repatriated to Japan, often while his or her Taiwanese family remained in Taiwan.[21]

40.     The United States did not authorize the ROC to issue the 1946 Nationality Decrees. While the United States was fully aware of these decrees, government officials communicated their position that such a Decree was legally unsupported and likely premature.  In a November 21, 1946, Aide-Memoire from the State Department to the Chinese Embassy, the State Department stated that "it is understood that the Chinese Government now considers all Taiwanese to be Chinese," but that "it should, however, be pointed out that from the legal standpoint the transfer of Taiwan's sovereignty remains to be formalized," and that such transfer "may contain provisions in regard to appropriate change in the national status of Taiwan's residents."[22]

---

[20] Letter, Foreign Service of the United States of American, from the American Embassy in Nanking to the Secretary of State, dated June 17, 1945, with enclosure: translation of, "Measures for the Adjustment of Nationality of Taiwanese Abroad."

[21] Nationality and International Law in Asian Perspective at pgs. 54-55.

[22] Aide-Memoire, Department of State to the Chinese Embassy, 749.00119 Control (Japan)/11-2146, dated November 21, 1946; *see also* Kimie Hara, *ed.*, The San Francisco System and Its

41.     A December 2, 1946 Department of State Telegram similarly stated that an order by the ROC Executive Yuan on January 12 had "restored to all Chinese people of the province of Taiwan their Chinese nationality on and from 25 October 1945."[23]

42.     The State Department was likewise aware of the Japanese legal position that the decree violated international law.   In September 1950, the American Consul General forwarded to the State Department an article by Kente Hiraga, then Chief of the Civil Affairs Bureau of the Tokyo Attorney General's Office and described by the American Consul General as "one of the leading experts of the Japanese Government on nationality...."[24] Mr. Hiraga notes that:

> It is up to the authority of each state to decide by its internal law who shall be its own nationals.... The Law Governing Disposition of Chinese Overseas Residents, promulgated by the Government of the Republic of China on June 22, 1946, provided that Formosan residents should automatically recover Chinese nationality as of October 25, 1945.  We do not question this from the standpoint of internal law of China, but we have a question as to the validity of this law form the standpoint of the international law.... pending conclusion of a peace treaty it cannot be interpreted that Formosans already have lost their Japanese nationality. [25]

43.     The effect of these decrees has functioned to render the people of Taiwan stateless. This Court has observed that:

> America and China's tumultuous relationship over the past sixty years has trapped the inhabitants of Taiwan in political purgatory. During this time the people on Taiwan have lived without any uniformly recognized government.   In practical terms, this means they have uncertain status in the world community which infects the population's day-to-day lives.   This pervasive ambiguity has driven

---

Legacies, Continuation, Transformation and Historical Reconciliation in the Asia-Pacific, Routledge, 2015, at pg. 128.

[23] Department of State Telegram No. 538 to Secretary of State from Tokyo, dated December 2, 1946.

[24] Foreign Service of The United States of America, Memorandum from Leo J. Callahan to Department of State, with enclosure: "On the New [Japanese] Nationality Law," Kenta Hiraga, Lawyers Association Journal, Vol. II, No. 6, pgs. 341-368.

[25] *Id at pgs. 4-5.*

Appellants to try to concretely define their national identity and personal rights.[26]

### In the Aftermath of Japan's Surrender, the ROC Administered Taiwan as The Agent of The Allied Powers, and in particular, the United States

44.     Both before and after the promulgation of the Nationality Decrees, the ROC acted in the aftermath of Japan's surrender as the agent of the United States.

45.     Chiang Kai-shek and his Chinese Nationalist Party began administering Taiwan on behalf of the Allied Powers beginning in 1945.  In 1949, Formosa became the only home of the Chinese Nationalist Party.  In that year, China's civil war between Chinese Nationalists and Communists ended with the establishment of the PRC and the ouster of the Chinese Nationalists from Mainland China.  The Chinese Nationalists, led by Chiang Kai-shek, remained in Taiwan, where they continued to administer the island for the Allied Powers as the ROC.[27]

46.     From the outset, American forces maintained military control over Formosa, even while giving Chiang Kai-shek's government wide latitude to govern.  In a December 1949 Memoranda to the Secretary of State, Senator Alexander Smith observed that:

> Since the Japanese Peace Treaty has not as yet been signed, Formosa is still legally a part of Japan where the United States, representing the conquerors of Japan[,] are now in occupation.[28]

---

[26] *Lin* at 503.

[27] *Lin* at 504 *citing* Revolution of 1949, http://www.state.gov/r/pa/ho/time/ cwr/88312.htm.

[28] United States Senate Committee on Foreign Relations Memorandum from Senator Alexander Smith to Dean Acheson, Walton Butterworth, dated December 27, 1949, at pg. 2.

47.     In a June 6, 1949, internal memorandum, the Department of State similarly stated that "juridically Formosa is still under the sovereignty of Japan to which it was ceded by China in 1895."[29]

48.     Congress understood the purview of the ROC to be purely administrative.  The Senate Committee on Foreign Relations submitted a Report to Congress in 1955 observing that: "Administrative control of the island was turned over to the Republic of China after the Japanese surrender in September 1945."[30]

49.     American diplomatic officials similarly understood Taiwan to be unambiguously under American control.  In a 1949 letter to Paul Hoffman, Administrator of the Economic Cooperation Administration ("ECA"), Roger D. Lapham, the chief of the ECA mission to China, wrote urgently from Taiwan in anticipation of the fall of the ROC in mainland China.  Mr. Lapham suggested from Taiwan that the ECA and the State Department appoint a Governor to separately administer Taiwan instead of continuing to rely upon the ROC.  Mr. Lapham observes that "I have been informed by military authorities that the loss of Formosa would be a severe blow to our [American] chain of island possessions."[31]  Likewise, Mr. Lapham shares his concern than "To go into Taiwan with a feeble program would, of course, be throwing away the American taxpayer's money completely."[32]

---

[29] Department of State Office Memorandum from Mr. Harding F. Bancroft to Mr. Rusk, dated June 6, 1949.

[30] Authorizing the President to employ the Armed Forces of the United States for protecting the security of Formosa, the Pescadores, and related positions and territories of that area. Report of the Committee on Foreign Relations [to accompany S. J. Res. 28], 84th Session of Congress, Report No. 13 at pg. 1.

[31] Letter, Roger D. Lapham, the chief of the ECA mission to China to Paul Hoffman, Administrator of the Economic Cooperation Administration ("ECA") from, dated 1949.

[32] *Id.*

50.     Indeed, a significant amount of American taxpayer money was committed, along with U.S. personnel, to rebuilding the economy and responsible governance of Taiwan.  The U.S. Government likewise expended considerable resources rebuilding the economy and industries of Taiwan.  An August 1951 staff report to the Senate Subcommittee of the Senate Appropriations Committee described the extensive role American resources played in rebuilding Taiwan through the Economic Cooperation Administration ("ECA"):

> [The] ECA has not hesitated to exert its considerable influence [in Taiwan] to bring about economic reforms or innovations.  It has had a hand, sometimes large, sometimes small, in the setting up of a national budget, revision of the tax structure to increase revenues, institution of a more austere import program, and creation of an economic stabilization board.  ECA officials participate actively, though unofficially, in day-to-day decisions concerning such matters as banking and currency, individual applications for foreign exchange, and over-all national economic planning.[33]

51.     The high level of economic involvement from the American agency was deemed appropriate because, "[t]he entire problem requires consideration and effective action.  It would seem that under the circumstances the United States is entitled to bear a hand in steering the course of the ship of state."[34]

52.     A more extensive American military occupying presence was avoided not because of concerns regarding the legality of any such military presence or occupation, but principally because relying upon the administration and military of Chiang Kai-shek to govern the island as an agent of the U.S. Government better served American economic and strategic military considerations.  In December 1949, the American counselor to the U.S. Embassy in Nanking wrote to the Secretary of State that:

---

[33] United States aid to Formosa, staff report to the Special Subcommittee on Foreign Economic Cooperation of the Senate Appropriations Committee, 82nd Session of Congress, first session, Subcommittee print at pg. 6.

[34] *Id.* at pg. 4.

[T]he Joint Chiefs of Staff are still of the opinion that any overt military commitment on Formosa would be unwise at this time. In spite of Formosa's strategic importance, the current disparity between our military strength and our many global obligations makes it inadvisable to undertake the employment of armed forces in Formosa."[35] Importantly, the Joint Chiefs of Staff do not regard Formosa and the Pescadores as of sufficient military importance to the United States under circumstances set forth above to commit United States forces to their occupation....[36]

53.     Upon making the decision to allocate military and economic resources thusly, the Truman Administration balanced conflicting considerations of their duty as the occupying force in Taiwan with the political desire to send a message to the international community that they would not use their position as occupier of Taiwan to turn the strategically important territory into a zone of influence. General MacArthur, a supporter and admirer of Chiang Kai-Shek, pushed the administration to engage more directly with the ROC commander. The Truman administration took a decidedly more conservative approach, acknowledging only when absolutely necessary their continuing status as the occupying force in Formosa.

54.     However, even a subdued American military presence was a significant presence. In a January 4, 1950 conversation between Congressman John Kee, Chairman of the House Foreign Relations Committee and Assistant Secretary of State for Legislative Affairs Jack McFall, Mr. McFall described of the American military presence in Taiwan in the wake of the establishment of the PRC on the mainland:

He then developed the present situation in Formosa calling attention to the large number of troops, air force, and Navy, that are on the Island; that they are well equipped with arms, armaments and implements of war and that as far as their military potentialities are concerned, there is no possible way that the Communists on the mainland could achieve a military conquest by invasion as they do not have landing barges and necessary military equipment to bring about a successful incursion. The Secretary pointed out the fact that if Formosa did fall to the

---

[35] Memorandum Respecting Formosa, from Mr. Butterworth to The Secretary, dated December 16, 1949, at pg. 3.

[36] *Id.* at pg. 5.

Communists by way of an internal falling apart, that we would still have the sea and air controls over the Island.[37]

55.     As the perceived need arose, General MacArthur understood the role of American forces in Taiwan as one fulfilling a responsibility to secure the island and other Japanese territories against any attack.  In a statement made upon return from a "reconnaissance" trip to Taiwan, the General observed:

> The policy has been enunciated that this island, including the Pescadores, is not under present circumstance subject to military invasion.  It is my responsibility and firm purpose to enforce this decision.  My conferences here on all levels have been most cordial and responsive in every respect.[38]

Ten days later, General MacArthur issued another statement, making clear that his trip to Taiwan dealt with "the problems of preventing military violence to Formosa, as directed by the President – the implementation of which directive is my responsibility."[39]

56.     On June 27, 1950, with the threat of American engagement in Korea looming, President Truman told the American people that the American forces on Taiwan were positioned to ensure and, if necessary, compel compliance of the ROC with the directives' of the Allies. President Truman ordered the 7th Fleet to prevent any attack on Formosa.  President Truman stated: "I am calling upon the Chinese Government on Formosa to cease all air and sea operations against the mainland."  Making clear that this directive was a command and not a request, President

---

[37] Memorandum of Conversation with Congressman John Kee, Chairman, House Foreign Relations Committee, and Jack McFall, dated January 4, 1950, Secretary of State File, Acheson Papers, Truman Library.

[38] General MacArthur's Statement on His Trip to Formosa, August 1, 1950, Truman Library.

[39] George H. Nash, ed., Freedom Betrayed: Herbert Hoover's Secret History of the Second World War and Its Aftermath, Hoover Institution Press Publication, 2011.

Truman added that "[t]he 7th Fleet will see that this is done."[40]  As for the legal status of Taiwan, President Truman observed that "[t]he determination of the future status of Formosa [Taiwan] must await the restoration of security in the Pacific, a peace settlement with Japan, or consideration by the United Nations."[41]

57.     The next day, the ROC Foreign Minister George K. C. Yeh officially accepted the President's command, stating that:

> In so doing, the Government of the Republic of China was prompted by the following considerations... pending the conclusion of the treaty of peace on Japan, the Government of the United States may share with the Government of the Republic of China the responsibility for the defense of Taiwan. [42]

58.     Barely a month later, the United States' 13th Air Force additionally set up liaison offices in Taipei.[43]

59.     Any strategic ambiguity undertaken by the Truman administration during this period was solely in response to the demands of the larger international political climate.  There was no confusion as to the status of the ROC as an agent in Taiwan of the United States.  As memorialized in an internal memorandum, the President communicated his position on Formosa thusly, in conversation with General MacArthur:

> [W]e also have very much in mind the general international situation and the moral and practical value of keeping the support of an overwhelming majority of the United Nations for our action in the Far East. Our present tactic is directed toward getting international support for the military neutralization of Formosa and for an

---

[40] 173 – Statement of the President on the Situation in Korean, June 27, 1950, Public Papers, Truman Library.

[41] *Id.*

[42] Chiu, Hungdah, China and the Question of Taiwan: Documents and Analysis, Praeger Publishers, New York, 1973 at pg. 229.

[43] *Id.* at pg. 142 *citing* China Handbook, China Publishing Co., Taipei, 1951, at pg. 494.

international determination that the problem of Formosa must be settled by peaceful means.[44]

During the same period, in an August 27, 1950 letter to Ambassador Warren Austin, President Truman described the status of the Chinese Nationalist government thusly:

> The actual status of the island is that it is territory taken from Japan by the victory of the Allied forces in the Pacific. Like other such territories, its legal status cannot be fixed until there is international action to determine its future. The Chinese Government was asked by the Allies to take the surrender of the Japanese forces on the island. That is the reason the Chinese are there now.[45]

60.     The United States government was similarly clear that Taiwan was not a territory to be jettisoned. A December 5, 1950 meeting between Secretary of State Dean Acheson, Senator James Webb, and various State Department officials, the Secretary of State summarized his meeting with President Truman the previous day:

> The Secretary said that he could summarize the meeting at the White House yesterday in a few words. He said that [British Prime Minister] Mr. Atlee had taken the position that at this time we had no choice except to negotiate with the Chinese [Communists]. These negotiations would, of course, extend beyond Korea and it was certain the price the Chinese [Communists] demanded would be Formosa, a seat in the UN, and recognition. The President stated that we were not prepared to proceed in his line and that was about all that the meeting produced.[46]

61.     Later in that conversation, Secretary of State outlined the Truman administration's proposals with regard to tensions in Korea as shared with British Prime Minister Atlee:

> In brief he outlined our proposals as follow: (1) fight as hard as we can; (2) if someone proposes a cease fire, we will accept it but we

---

[44] Memorandum, "Substance of Statements Made at Wake Island Conference," dated October 15, 1950. Secretary of State File, Acheson Papers, Truman Library, at pg. 25.

[45] 223. Letter to Ambassador Warren Austin Restating the U.S. Position on Formosa, dated August 27, 1950, Public Papers of the President, Truman Library.

[46] Department of State Memorandum of Conversation, dated December 5, 1950, Harry S. Truman Library & Museum Acheson Memoranda of Conversation at pg. 1.

will not pay anything for it; (3) if a cease fire is not accepted or is accepted and the Chinese [Communists] later start fighting again, we will start again and we must fight the best we can--we will not run out; and, (4) if we are thrown out, we will try to harass the Chinese [Communists] all we can by economic blockade or such action as we may be able to take. **Under no circumstances would we agree to turn over Formosa as a condition to settle**.[47]

62.     Importantly, on May 4th, 1951, as reported by the *New York Times* the following day, General Douglas MacArthur had occasion to articulate for the Senate Foreign Relations Committee the exact status of Taiwan.  In testimony given in a Committee hearing, General MacArthur stated:

> Senator Russell: One question, General. I am not clear in my own mind as to the exact status of Formosa at the present time. It has been in Japanese hands for many years prior to the defeat of Japan in World War II. Has the status of Formosa ever been finally determined by any formal treaty?
>
> General MacArthur: It has not, sir. Legalistically it is still a part of defeated Japan. The disposition of the various segments of the Empire of Japan has not yet been formally determined. There were certain agreements that were entered into, as I understood it, at Yalta and other places, but legalistically Formosa is still a part of the Empire of Japan.
>
> Senator Russell: Japan has title until such time as the peace treaty might divest them of it?
>
> General MacArthur: **The Allies turned over what you might call the administration and the trusteeship of Formosa to China, just as Japan was turned over to us, and it is still in that status**.[48]

63.     General MacArthur's ability to speak for the administration and issue authoritative statements on American foreign policy at that time is underlined by the Truman administration's

---

[47] *Id.* at pg. 3 (emphasis added).

[48] "The General Declines to Say That U.S. Has Lost the Initiative in Foreign Policy Matters," *The New York Times*, May 5, 1951 at A7 (emphasis added).

handling of General MacArthur. While the Truman administration took no issue with this particular section of General MacArthur's characterization of the legal status of Taiwan, the President took General MacArthur's public statements very seriously, paying attention to any of the General's statements that ran afoul of the administration's position given that General MacArthur's statements could stand "as an authoritative US statement."[49]

64. Likewise, in April 1951, when the ROC requested that the United States transmit an invitation to the Japanese Government to establish an overseas agency in Taipei, the State Department was concerned that the establishment of an Agency might "imply Japanese recognition of the Chinese National Government," but reasoned that such an objection was not worth pursing since the status of any such agency would be "inferior to that of a consulate," and thus not inappropriately imply recognition of the ROC as a sovereign government.[50]

65. This position of the United States government remained unaltered after the entry into force of the SFPT. In 1955, United States Secretary of State John Foster Dulles stated:

> [I]n 1945, the [ROC] was entrusted with authority over [Taiwan]" and
> "General Chiang [Kai-shek] was merely asked to administer [Taiwan] for
> the Allied . . . [P]owers pending a final decision as to their ownership."[51]

66. Indeed, several years later, the State Department would continue to use the undefined status of Taiwan as the legal justification for the United States' military actions, as an Allied power, to defend Taiwan:

> [N]either in [the SFPT] nor in any other treaty has there been any definitive cession
> to China of Formosa. The situation is, then, one where the Allied Powers still have

---

[49] Memorandum, "Foreign Policy Aspects of the MacArthur Statement," dated August 26, 1950, Secretary of State File, Acheson Papers, Truman Library.

[50] Office Memorandum from Mr. Overton to Mr. Johnson, dated April 4, 1951.

[51] *See* Statement by Secretary John Foster Dulles, Department of State Bulletin, February 1955, at pg. 329; *see also* N.Y. Times, Feb. 7, 1955, at A1; Y. Frank Chiang, *One-China Policy and Taiwan*, 28 Fordham Int'l L.J. 1, 35, nn.158, 159 (2004).

to come to some agreement or treaty with respect to the status of Formosa. Any action, therefore, of the Chinese Communist regime to seize Formosa constitutes an attempt to seize by force territory, which does not belong to it. Such a seizure is prohibited by international law and the United Nations Charter as an attempt to settle claim to territory by force. It would thus appear that the United States is within its legal rights in taking action to defend Formosa.[52]

67.     The British view was consistent with the American view. In 1950, British Foreign

Secretary Kenneth Younger stated:

> Formosa is still de jure Japanese territory and there is no Government of Formosa as such. Following on the surrender of Japan, the Chinese Government of the day assumed, with the consent of the remaining Allies, the provisional administration of the territory pending the final determination of its status at a peace settlement.[53]

68.     Likewise, British Foreign Secretary Anthony Eden stated in 1955:

> The administration of Formosa was taken over from the Japanese by Chinese forces at the direction of the Supreme Commander of the Allied Powers. The arrangements made with Chiang Kai-shek put him there on a basis of military occupation pending further arrangements, and did not of themselves constitute the territory Chinese.[54]

---

[52] China and the Question of Taiwan: Documents and Analysis at pg. 293 *citing* Excerpt from Department of State Bulletin, XXXIX, 1017 (December 22, 1958), pgs. 1009-1010.

[53] 478 Parl. Deb., H.C. (5th ser.) (1950) 60.

[54] 536 Parl. Deb., H.C. (5th ser.) (1955) 159.

### The Aftermath of the San Francisco Peace Treaty

69.     On September 8, 1951, the Allied Powers[55] signed the Treaty of Peace with Japan in San Francisco, California (the "SFPT").[56]  The SFPT entered into force on April 28, 1952.[57]  Currently, 46 countries are parties to the SFPT, but neither the PRC nor the ROC are signatories.[58]

70.     Pursuant to the SFPT Article 2(b), Japan renounced "all right, title and claim to Formosa and the Pescadores."[59]  The SFPT did not declare which government would exercise sovereignty over Taiwan going forward, but did identify the United States as "the principal occupying power."[60]

71.     When the Allied Powers signed the SFPT on September 8, 1951, they did not intend to give sovereignty over Taiwan to China.  Prior drafts of Article 2(b) show that the Allied Powers originally contemplated giving China sovereignty over Taiwan.[61]

---

[55] The "Allied Powers" are defined as "Australia, Canada, Ceylon, France, Indonesia, the Kingdom of the Netherlands, New Zealand, Pakistan, the Republic of the Philippines, the United Kingdom of Great Britain and Northern Ireland, and the United States of America" in Article 23(a) of the Treaty of Peace with Japan (*see* n. 39 *infra*).

[56] Treaty of Peace with Japan, Sept. 8, 1951, Allied Powers-Japan, 136 U.N.T.S. 46 (ratification advised by Senate, Mar. 20, 1952; ratified by President, Apr. 15, 1952; ratification deposited at Washington, Apr. 28, 1952; proclaimed by President Apr. 28, 1952; entered into force Apr. 28, 1952) (hereinafter "SFPT").

[57] Treaties in Force 2006, at 495, *available at* http://www.state.gov/documents/organization/65540.pdf.

[58] *See* Treaties in Force 2006, at 495, *available at* http://www.state.gov/documents/organization/65540.pdf.

[59] SFPT, art. 2(b).

[60] *Lin* at 504.

[61] Memorandum from Hugh Borton to Charles E. Bohlen: Draft Treaty of Peace for Japan, State Dep't Decimal File No. 740.0011 PW (PEACE)/8-647 CS/W, State Dep't Records, Record Group 59 (Aug. 6, 1947); Memorandum, Background of Draft of Japanese Peace Treaty, State Dep't Decimal File No. 740.0011 PW (PEACE)/1-3048 CS/W, State Dep't Records, Record Group 59 (Jan. 30, 1948); *see also* Seokwoo Lee, *The 1951 San Francisco Peace Treaty with Japan and the Territorial Disputes in East Asia*, 11 Pac. Rim L. & Pol'y 63, 124, nn.275, 14, 15 (2002).

72.     United States Secretary of State John Foster Dulles told the Senate in December 1954, "[the] technical sovereignty over Formosa and the Pescadores has never been settled.  That is because the Japanese peace treaty merely involves a renunciation by Japan of its right and title to these islands.  But the future title is not determined by the Japanese peace treaty, nor is it determined by the peace treaty which was concluded between the [ROC] and Japan."[62]

73.     Notably, in July 1952, the American Embassy in Tokyo reported to the State Department their view of the position of the Japanese government regarding Taiwan at the outset of the Treaty:

> The only thing to which Japan has agreed is a renunciation of sovereignty, thus leaving the islands of Formosa and the Pescadores floating unattached and uncontrolled in some misty limbo of international law where the Japanese in some way hope they will remain until the fortune of events makes them once again available to Japan.[63]

74.     The international community, including the United Nations and the United States, does not recognize Taiwan as a state.

## V.

## LEGAL STATUS OF THE PLAINTIFF'S NATIONALITY

75.     In 1946, while the ROC was administering Taiwan on behalf of, and as the agent of, the United States, the ROC passed nationality decrees that functioned to deprive the people living in Taiwan at that time, as well as their descendants, with Japanese nationality and imposed upon them a nationality that is not currently recognized by the international community with any

---

[62] *See* Statement by Secretary John Foster Dulles, Department of State Bulletin, Dec. 1954, at pg. 896.

[63] Foreign Service Dispatch from the American Embassy, Tokyo, to the Department of State, Dispatch No. 50, dated May 13, 1952, at pg. 3.

uniformity or consistency.[64] This court has acknowledged that the current status of the nationality of the people living in Taiwan is undefined such that they are in a position to desire to "concretely define their national identity."[65]

76.   In 1952, a Japanese Ministry of Foreign Affairs official told the Japanese House of Representations Standing Committee for Foreign Affairs that the status of Taiwan remained undefined and that, likewise, the inhabitants of Taiwan had lost their Japanese nationality.[66] Similarly, Mr. Kanichiro Ishihara, Japanese Vice Minister of Foreign Affairs, stated that a recently signed (and later abrogated in its entirety) Treaty of Peace between the ROC and Japan, only "deemed" to include the inhabitants of Taiwan as nationals of the ROC for the purposes of understanding the terms of the Treaty but purposefully stopped short of proclaiming that the inhabitants of Taiwan "are nationals" of the ROC.  As Mr. Ishiara stated, such a proclamation as to the ROC nationality of the Taiwanese could not be made by the Japanese given that "the territorial issue has not yet been brought to a final resolution."[67]  As of May 1952, it was the position of the Japanese Government that no signed treaty resolved either the legal status of Taiwan or the nationality of the former Japanese nationals living on Taiwan.

---

[64] *See Lin* at 504 ("America and China's tumultuous relationship over the past sixty years has trapped the inhabitants of Taiwan in political purgatory. During this time the people on Taiwan have lived without any uniformly recognized government. In practical terms, this means they have uncertain status in the world community which infects the population's day-to-day lives. This pervasive ambiguity has driven Appellants to try to concretely define their national identity and personal rights.")

[65] *Id.*

[66] "Historical and Legal Aspects of the International Status of Taiwan," Yuzig Chiautong Ng, February 10, 1972, *citing* The 13th Japanese National Diet, House of Representatives, Standing Committee Record, Vol. 4, no. 25, pg. 25.

[67] "Historical and Legal Aspects of the International Status of Taiwan," Yuzig Chiautong Ng, February 10, 1972, *citing* The 13th Japanese National Diet, House of Representatives, Standing Committee Record, Vol. 4, no. 28, pg. 7.

77.     Later that year, Japanese M.P. Yobun Kaneko stated in the Japanese Committee on Foreign Affairs, "[i]n the present circumstances Taiwan is neither a Chinese territory nor a Japanese territory.  So the Taiwanese are neither Japanese nor Chinese."[68]

78.     The UN Charter states that its purpose is "[t]o develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples, and to take other appropriate measures to strengthen universal peace."[69]

79.     Article 15 of the Universal Declaration of Human Rights states:

(1) Everyone has the right to a nationality.

(2) No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.[70]

80.     The Universal Declaration of Human Rights is a document meant to supplement the definition of "fundamental freedoms" and "human right" in the United Nations Charter, and has been referenced as "an obligation for the members of the international community to all persons."[71]

81.     The 1961 Convention on the Reduction of Statelessness ("1961 Convention") is a detailed reflection of customary international law on the subject of the individual and the collective right to determine one's own nationality.

82.     Article 7(6) of the 1961 Convention articulates the basic international norm that a person shall not lose their nationality if such a loss would render him stateless.

---

[68] "Historical and Legal Aspects of the International Status of Taiwan," Yuzig Chiautong Ng, February 10, 1972, *citing* The 13th Japanese National Diet, House of Councilors, Standing Committee Record, Vol. 5, no. 40, pg. 3.

[69] UN Charter, Ch. 1, Art. 1, pt. 2.

[70] 1948 Universal Declaration of Human Rights, art. 15.

[71] 1968 United Nations International Conference on Human Rights.

83.     The Nationality Decrees of 1946 effectuated a deprivation of Japanese nationality without the consent of the people of Taiwan, in violation of customary international law.

84.     The Nationality Decrees of 1946 effectuated a deprivation of one nationality, without the provision of another cognizable nationality, also in violation of international law.

## VI.

## **<u>RELIEF REQUESTED</u>**

Considering that this Court has the constitutional power and duty to interpret treaties, statutes, and the Constitution, including customary international law, Plaintiffs respectfully pray that this Court enter an Order declaring that:

(a)     Promulgated while Taiwan was under the control of the United States as the lead Allied Power, the 1946 Nationality Decrees stripping the entire population of Taiwan of their Japanese nationality, and causing the population to become stateless as they remain to this day, were promulgated without the authorization of the ROC's principal, the United States;

(b)     Promulgated while Taiwan was under the control of the United States as the lead Allied Power, the 1946 Nationality Decrees are invalid because the ROC, acting as the agent of the United States, was not authorized by the United States to promulgate such nationality decrees.

(c)     Promulgated while Taiwan was under the control of the United States as the lead Allied Power, the 1946 Nationality Decrees violated international laws, as articulated in the Universal Declaration of Human Rights, the UN Charter, and the 1961 Convention on the Reduction of Statelessness; and

(d)     The 1946 Nationality Decrees are invalid because they violated international laws, as articulated in the Universal Declaration of Human Rights, the UN Charter, and the 1961 Convention on the Reduction of Statelessness.

Respectfully submitted,

Charles H. Camp (D.C. Bar No. 413575)
LAW OFFICES OF CHARLES H. CAMP. P.C.
1025 Thomas Jefferson Street, N.W.
Suite 115G
Washington, D.C. 20007
Telephone:  (202) 457-7786
Facsimile:   (202) 457-7788
E-mail:  ccamp@charlescamplaw.com

*Counsel for Plaintiffs*
*Dr. Roger C.S. Lin*
*Julian T. A. Lin*
*Taiwan Civil Government*

February 27, 2015